Filed 5/28/15  In re A.R. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re A.R. et al., Persons Coming Under the Juvenile Court Law. | B255659 (Los Angeles County Super. Ct. No. DK02062) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. A.B., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge.  Affirmed.

Law Office of Robert McLaughlin and Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saldino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

A.B. (father) appeals from the dependency court's jurisdictional and dispositional orders regarding his six-year-old daughter, B.B. The court assumed jurisdiction over B.B. after finding that father had sexually abused B.B.'s half sister, A.R.[1] The court removed B.B. from father's custody, placed B.B. with her mother (mother), and ordered monitored visits between father and B.B. Father contends that the jurisdictional and dispositional orders were not supported by substantial evidence. We disagree and affirm.

## FACTUAL AND PROCEDURAL HISTORY

### I.      Initial Investigation and Detention

This case arose on September 4, 2013 after a teacher reported that 15-year-old A.R. disclosed she had been raped and was afraid to go home. Later that day, a Los Angeles County Department of Children and Family Services (DCFS) social worker met A.R. at the police station where she had been interviewed by Officer Rendon.

A.R. told Officer Rendon that her mother's boyfriend, father, had touched her inappropriately on several occasions during the last three years. A.R. reported that about two years earlier, she was sleeping in mother's bed and awoke when father came into the bedroom, removed all his clothes, straddled her, placed his hands behind her back, and pulled her body toward his. A.R. pushed father away and he left the room. She denied penetration. During another incident one-and-a-half years earlier, A.R. awoke in her bed to father fondling her bare breast underneath her shirt and brassiere. With his other hand, father was rubbing the outside of her vagina underneath her shorts and underwear. Seconds later, when A.R.'s adult brother, Guadalupe, walked into the room, father pretended to fall and accidentally touch her. A.R. again denied penetration. A.R. also reported that on several other occasions father had touched her legs inappropriately and spanked her buttocks. The most recent incident took place four weeks earlier after father and A.R. dropped off Guadalupe at work. During the drive home, father caressed A.R.'s

---

[1]      Father does not challenge the court's jurisdictional and dispositional orders regarding A.R.

2

bare leg (she was wearing shorts) and told her she had "very nice legs." A.R. stated she never reported the abuse because she thought mother would not believe her. A.R. claimed she had never seen father act inappropriately toward her siblings.

Officer Rendon also interviewed mother. Mother reported that A.R. never disclosed the abuse and that she did not believe A.R.'s allegations. Mother claimed A.R. was very close with father, often wanted to go places with him, and never appeared afraid of him.

On September 4, 2013, the social worker interviewed A.R.; A.R.'s nine-year-old brother, Angel; her six-year-old half sister, B.B.; her 18-year old brother, Guadalupe; and mother, all of whom resided in the family home. A.R. confirmed she told her teacher that she had been "raped." A.R. reported father had touched her inappropriately several times over the past two-and-a-half years. The first incident occurred when A.R. was sleeping on the couch. A.R. awoke when she felt father touching her breast under her bra. Father told A.R. he had slipped. On another occasion, father rubbed A.R.'s vagina under her clothes while A.R. pretended to be asleep. Yet another incident occurred in the morning while mother was at therapy. While A.R. slept, father entered the bedroom and disrobed. A.R. opened her eyes and she saw father remove his underwear and walk toward her. When father attempted to straddle A.R., she pushed him off. Father appeared upset, picked up his clothes, and left the room without speaking.

A.R. reported that on several occasions father rubbed her shoulders or spanked her buttocks. She stated those incidents occurred when no one was home, when her siblings were asleep, and while she was alone in her bedroom, usually in the morning or at night. A.R. reported the most recent incident occurred four weeks earlier. On their way home from dropping off Guadalupe at work, father began to caress A.R.'s legs. As father's hand got closer to her vagina, A.R. pulled away, and father stopped.

However, A.R. said she was afraid of father and feared returning home. A.R. claimed she was tired of holding this in and needed to tell someone. She denied witnessing father behaving inappropriately toward her siblings.

3

B.B. denied physical, sexual, and verbal abuse. She reported that father was nice to her and never made her feel uncomfortable. She denied being fearful of anyone in the home and stated that she felt safe there. Angel likewise denied abuse and reported that father was nice to him. He denied ever witnessing father behaving inappropriately with anyone in the home. Guadalupe reported that he had never seen father acting inappropriately toward A.R. He did not believe father sexually abused A.R.

Mother informed the social worker she was not married to father but had lived with him for six years. She was shocked by A.R.'s allegations. Mother reported that A.R. appeared to get along well with father and always volunteered to go places with him. She did not understand how A.R. could always want to be around father if he had sexually abused her. Further, when mother and father separated several months earlier, A.R. encouraged mother to give father another chance. Mother indicated father could not have abused A.R. while mother was in therapy because father left for work four hours before therapy started. Mother stated she had a good relationship with A.R. and believed A.R. would have reported the abuse to her if it had occurred. Mother also reported that A.R. had made similar abuse allegations against a teacher that were found false.

Officer Rendon initially informed the social worker that father was going to be placed under arrest. However, he later reported that father would not be arrested due to discrepancies in A.R.'s allegations. He said the case would be given to the district attorney. The social worker later confirmed the district attorney did not file a case against father.

In interviews on September 5 and 9, 2013, father adamantly denied A.R.'s allegations but agreed to stay out of the family home during DCFS's investigation. He was shocked by A.R.'s allegations. He stated he had known A.R. since she was one year old, viewed her as a daughter, and would never act inappropriately with her. Father suggested A.R. might have become jealous over his increasingly close relationship with mother.

On September 18, 2013, DCFS conducted a forensic interview of A.R. A.R. reported father "touched me down there" and caressed her leg, back, arm, and "leg near

4

middle." She stated father once touched her breast when she was on the couch. He acted like it was an accident, and said "Sorry, I almost fell." A.R. reported that these incidents started two to three years earlier. A.R. reported the first incident took place when she was sleeping in a bedroom. She awoke when father entered the bedroom and removed his clothes. Father grabbed A.R. by the back while she was lying down and put his legs around hers. A.R. claimed B.B. was in the bedroom but remained asleep. On another occasion, A.R. was laying on the couch in the living room, and father put his hands under her blouse and in her pajama pants. Father caressed her breast, her vagina, and then her breast again. A.R. denied penetration. She also reported father caressed her legs and rubbed her back on two occasions when she was riding in the car with father after dropping off Guadalupe at work. The forensic interviewer reported there was no reason to believe sexual abuse did not occur and A.R. appeared credible.

## II.     Section 300 Petition and Detention Hearing

On October 30, 2013, DCFS filed a petition under Welfare and Institutions Code section 300, subdivisions (b), (d), and (j) alleging that A.R., B.B., and Angel came within the jurisdiction of the dependency court.[2] The petition alleged that father's sexual abuse of A.R., and mother's failure to protect her, endangered A.R.'s physical health, safety, and well-being, created a detrimental home environment, and placed A.R., B.B., and Angel at risk of physical harm, damage, danger, sexual abuse, and failure to protect.

The dependency court held the detention hearing the same day. The court found a prima facie case that A.R., B.B., and Angel were persons described under section 300. The court released all three children to mother, detained B.B. from father, and granted father monitored visits with B.B. and Angel. The court ordered father to have no contact with A.R.[3]

---

[2]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[3]     A.R.'s, Angel's, and Guadalupe's father did not participate in the dependency court proceedings and does not participate in this appeal.

5

### III. Jurisdictional/Dispositional Filings

DCFS filed its jurisdiction/detention report (jurisdiction report) on December 10, 2013. In a November 25, 2013 interview, A.R. reiterated her sexual abuse allegations. A.R. reported that on one occasion she and B.B. were sleeping in mother's bed after mother had left for therapy. Father entered the room, took off his pants and shirt, but not his underwear, and tried to get on top of A.R. A.R. pushed father off and he left after giving A.R. an angry look. B.B. remained asleep. On another occasion when asleep on the couch, A.R. woke up to father touching her breast under her shirt. Father then fondled A.R.'s genitals under her pants. A.R. pretended to be asleep. Father stopped when he heard the door begin to open. When Guadalupe entered, father told him he had tripped and fallen on A.R. A.R. reported that father slapped her buttocks on at least four occasions. On at least three occasions, father put his hand on A.R.'s back under her shirt and touched her leg near her crotch after dropping Guadalupe off at school. The social worker questioned A.R. about the bedroom incident and father's work and mother's therapy schedules. A.R. responded that the incident took place during a one-month period when father was out of work.

The social worker also interviewed A.R.'s three siblings on November 25, 2013. They again denied abuse and reported getting along well with father. Guadalupe remained skeptical of A.R.'s allegations. He stated he did not recall ever finding father on top of A.R. He also could not recall a time when father was unemployed or other instances, except for weekends, when father stayed home from work.

In a November 25, 2013 interview, mother expressed a desire to support A.R., but continued to doubt A.R.'s allegations. Mother reiterated that father could not have abused A.R. while mother was at therapy due to their schedules: father went to work at 5:00 a.m., A.R. went to school at 7:00 a.m., and mother went to therapy at 9:00 a.m. Mother doubted father could have abused A.R. at night because mother was "always home." Mother said she was surprised and hurt that A.R. did not report the abuse to her and also wondered why A.R. had not disclosed the abuse to other family members.

6

Mother reported that after recently reconciling, her relationship with father had become more loving. Mother did not think A.R. liked their new relationship. Mother noted A.R. made the allegations against father just two weeks after mother and father reunited. Mother also noted that one month before A.R. accused father, she became friends with a girl whose stepfather had sexually molested her. Mother stated that A.R. always sent text messages to a certain phone number when she had to talk about the abuse or go to court. She did not send messages to the number at any other time.

Mother did not think A.R. exhibited the attitude of someone who had been sexually abused. Mother reported that if she was sitting on the couch or lying in bed with father, A.R. would sit or lie between them. A.R. would play with father and go everywhere with him. Mother also said that A.R. was "all over her boyfriend (kissing and hugging)" during her forensic interview.

The social worker interviewed father on December 3, 2013. Father again denied A.R.'s allegations. Father stated that he saw A.R. as his daughter and was not capable of sexually abusing her. Father believed A.R. was jealous of his improved relationship with mother. Father reported that A.R. wanted to go everywhere with him, sometimes referred to him as "daddy," and had him talk to her boyfriend. Father noted that A.R. claimed the abuse began two-and-a-half years earlier. He said he and mother were separated from December 2009 to January 2011.[4] After father and mother reconciled, father would leave for work at 4:00 a.m. Father stated he had the same job since June 2011, always started work at either 4:45 or 5:45 a.m., and never took time off. Father also reported mother was always home, people were always in the house, and he was never alone in the house with A.R. Father further reported he had not had contact with mother since the October 30, 2013 hearing, and they were no longer together.

DCFS expressed concerns about the veracity of A.R.'s allegations. It noted that, while A.R. was adamant and consistent in her allegations against father, they were contradicted by the statements of A.R.'s siblings, mother, and father. DCFS also noted

---

[4] January 2011 preceded A.R.'s September 2013 accusations by approximately two years and eight months.

7

that A.R.'s actions and behaviors were not consistent with those of a child who had suffered trauma. Nonetheless, DCFS concluded that "there are inconsistencies and inconclusive evidence which cannot refute or negate that sexual abuse occurred." DCFS accordingly recommended that the court sustain jurisdiction over all three children, under section 300, subdivisions (b), (d), and (j).

On December 19, 2013, DCFS filed a last minute information for the court, including employment records from father's employer. Father provided the records to refute A.R.'s claim that he had been out of work for a one-month period. DCFS stated the records demonstrated father had been working consistently.

DCFS filed an addendum report on March 24, 2014. It reported father had completed parenting classes and individual counseling. The report also stated father's employment records indicated he had worked continuously since July 2011.

In a March 12, 2014 interview, A.R. again reiterated her sexual abuse allegations. A.R. reported that on three occasions father slapped her behind when her mother and siblings were in other rooms or outside. Regarding the incident in the bedroom, A.R. reported mother left for work and told A.R. to watch B.B. and not leave her alone. A.R. stated mother never left B.B. alone with father, but A.R. could not explain why. A.R. also reported that about two years earlier father grabbed her breast while she was sleeping on the couch. When Guadalupe entered the room, father pretended he tripped. A.R. remained adamant that father had been unemployed but could not remember a date.

DCFS also interviewed mother on March 12, 2014. Mother stated she would support A.R. regardless of the outcome of this case. She reported she did "not plan on reuniting with father." Nonetheless, mother reported B.B. and Angel missed father, and she would like to monitor father's visits so they could see him more often. Mother denied the allegation that she would not allow father to care for B.B.

DCFS continued to express concerns about the veracity of A.R.'s allegations, but again concluded that the inconsistencies and inconclusive evidence did not refute them. DCFS therefore reiterated its prior recommendation that the court sustain jurisdiction over all three children.

8

### III. Jurisdictional/Dispositional Hearing

The court held the combined jurisdictional and dispositional hearing on March 24 and 26, 2014. The court admitted into evidence DCFS's jurisdiction report, the December 19, 2013 last minute information for the court, and the March 24, 2014 addendum report. The court then heard witness testimony.

#### A. Witness Testimony

A.R. initially testified she did not have a problem with father and he had never done anything to bother her. However, A.R. then said she remembered telling the social workers about father's inappropriate touching. She claimed the touching really happened. A.R. testified that "a couple of times" when she was 14 years old, father spanked her on the buttocks with his hand when she was washing dishes. She also testified that when she was 14 years old father once touched her breasts under her clothes while she was asleep on the couch. When she felt father touching her breasts, she opened her eyes, but father did not say anything. This was the first time father touched her inappropriately.

A.R. then testified there were no other times father had inappropriately touched her. However, when asked whether she told a social worker about an incident in bed, A.R. confirmed she had and that the incident really happened. A.R. stated that when she was 14, she was asleep on her stomach next to B.B. in mother's room. Mother was at therapy. Father came into the room and, while on top of A.R., touched her sides like he "was trying to get me," "trying to pick me up." A.R. denied that father touched her between her legs or anywhere else. Ultimately, father did not pick A.R. up, and he left. A.R. said father did not try to touch B.B., and she did not wake up.

A.R. also testified father would touch her inappropriately when they dropped off Guadalupe at work. Father would put his hand on A.R.'s back, inside her shirt and between her legs. Father did not touch A.R.'s "private part" because she would "pull back."

A.R. testified that during one incident father pretended to trip and fall on her when Guadalupe entered the room. As a result, Guadalupe did not see the abuse.

9

A.R. could not think of any other time father inappropriately touched her. She also stated she decided to tell her teacher because she "couldn't hold it anymore" and "wanted to take it off my chest." A.R. admitted she encouraged mother to work things out with father when they were separated.

DCFS next called father as a witness. He asserted his Fifth Amendment right against self-incrimination and was not questioned.

Guadalupe testified he had never seen father inappropriately touch A.R. or B.B. He did not remember a time when father had fallen on A.R. and claimed he had tripped. Guadalupe said father had never driven him and A.R. to school together, and father never drove him to work with only A.R. in the car. Guadalupe testified that father never was unemployed, that he began work at 4:00 or 5:00 a.m. and returned home at 2:00 or 3:00 p.m., and that he worked every day except weekends. Guadalupe confirmed A.R. indicated she wanted father to return home when he previously separated from mother. He said when father moved back into the home, A.R. would lie down between mother and father and always was "right there with them."

### B.    Argument

Father asked the court to dismiss the section 300 petition in its entirety because A.R. was not credible. A.R.'s counsel maintained A.R.'s abuse allegations were consistent and asked the court to sustain the petition. Counsel for B.B. and Angel also asked the court to sustain the petition. She argued A.R.'s statements were consistent and credible and B.B. and Angel were similarly at risk, especially because father had molested A.R. while B.B. slept in the same bed. DCFS joined the arguments of minors' counsel. DCFS also argued Guadalupe's testimony was not inconsistent with A.R.'s description of the events and father's employment records indicated an approximately one month gap in February 2012.

### C.    The Court's Findings and Orders

Following argument, the court stated that A.R. had "been consistent and that there really hasn't been a clear rationale as to why she would make this up." The court struck Angel from the petition and, after DCFS stipulated to strike mother, amended the petition

10

to delete them from it.  The court found all counts in the amended petition to be true by a preponderance of the evidence.[5]

For disposition, the court considered the same evidence and testimony.  The court stated, "I also think it says a lot that it was like pulling teeth for [DCFS] to get [A.R.] to feel comfortable talking about what occurred.  If she had just gotten up on this witness stand and immediately blurted out he did this, that, and the other, that would have been one thing.  But when she started out by saying that he hadn't done anything to make her uncomfortable, et cetera, and [DCFS] really had to pull it out of her, I think that actually added to her credibility."

The court found by clear and convincing evidence that substantial danger existed to A.R. and B.B.'s physical health, safety, protection, or physical or emotional well-being.  The court declared A.R. and B.B. dependents of the court, removed B.B. from father, and placed the children with mother.  The court granted father monitored visits with B.B.

Father timely appealed.[6]

## DISCUSSION

### I.     Judicial Notice

Following this appeal, the court entered a minute order dated January 14, 2015. The order indicated the court terminated jurisdiction over B.B. and issued a custody order

---

[5]     The section 300, subdivisions (b), (d), and (j) counts in the amended and sustained petition identically stated:  "In August of 2013 and on prior occasions, the children [A.R.] and B.B.'s [mother's male companion, father], father of the child [B.B.], sexually abused the child [A.R.] for three years by fondling the child's vagina, breasts, legs, and shoulders.  On a prior occasion, [father] removed his clothes and straddled the child, grabbing the child's body while the child lay in bed.  On prior occasions [father] slapped the child's buttocks.  Such sexual abuse of the child [A.R.] by [father] endangers the child's physical health, safety and well-being, creates a detrimental home environment and places the child and the child's sibling [B.B.], at risk of physical harm, damage, danger, sexual abuse and failure to protect."

[6]     DCFS filed a motion to dismiss this appeal due to irregularities in the notice of appeal father filed without the assistance of an attorney.  We denied the motion.

11

granting the parents joint legal custody, mother sole physical custody, and father unmonitored visitation in a public setting. DCFS filed a motion requesting we take judicial notice of the January 14, 2015 order. Father opposed the motion.

"Appellate courts rarely accept postjudgment evidence or evidence that is developed after the challenged ruling is made. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 405, 413–414 [].)" (*In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1416.) Nonetheless, postjudgment evidence is admissible for the limited purpose of determining whether any subsequent developments have rendered the appeal moot. (See *In re Karen G.* (2004) 121 Cal.App.4th 1384, 1390.) A reviewing court may take judicial notice of the records of any court within the state. (Evid. Code §§ 459, subd. (a), 452, subd. (d)(1).) We therefore grant DCFS's request for judicial notice, but limit our consideration of the January 14, 2015 order to our determination of mootness.

"When no effective relief can be granted, an appeal is moot and will be dismissed. [Citation.]" (*In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315-16.) "An issue is not moot if the purported error infects the outcome of subsequent proceedings." (*In re Dylan T.* (1998) 65 Cal.App.4th 765, 769.) Here, our decision could impact the foundation of the dependency court's subsequent adverse custody and visitation orders. (See *In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1548.) Accordingly, father's appeal is not moot.

II.     **Substantial Evidence Supports the Jurisdictional and Dispositional Orders**

      A.     **Standard of Review**

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] "'[T]he [appellate] court must review the whole record in the light most

12

favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].'" [Citation.]" (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

### B. The Jurisdictional Order

#### 1. *The Court's Findings that Father Sexually Abused A.R.*

Father consistently denied he sexually abused A.R. Nonetheless, he does not challenge on appeal the court's findings that he sexually abused A.R. because he recognizes we must defer to the dependency court's credibility determinations. "We cannot reject the testimony of a witness that the trier of fact chooses to believe unless the testimony is physically impossible or its falsity is apparent without resorting to inferences or deductions. As part of its task, the trier of fact may believe and accept as true only part of a witness's testimony and disregard the rest. On appeal, we must accept that part of the testimony which supports the judgment. [Citation.]" (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 830.) In other words, we do not disturb the trial court's determination unless it exceeds the bounds of reason. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.)

Here, although her family members did not believe her accusations against father, the court found A.R. to be credible and accepted her allegations of sexual abuse. We are bound by the court's findings that father sexually abused A.R..

#### 2. *Father's Sexual Abuse of A.R. Put B.B. at Substantial Risk*

Although there is no evidence in the record that Father sexually abused B.B., Section 300, "does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction." (*In re I.J., supra,* 56 Cal.4th at p. 773.) The section 300 subdivisions at issue here—subdivisions (b), (d), and (j)—"require only a 'substantial risk' that the child will be abused or neglected." (*Ibid.*) "The legislatively declared purpose of these provisions 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and

13

emotional well-being of children *who are at risk of that harm.*' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*In re I.J., supra,* 56 Cal.4th at p. 773.)

The court sustained the dependency petition as to B.B. under section 300, subdivisions (b), (d), and (j). "'"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re I.J., supra,* 56 Cal.4th at p. 773.) Subdivision (j) of section 300 most closely describes the situation regarding B.B., and we accordingly focus on that subdivision.

"Subdivision (j) applies if (1) the child's sibling has been abused or neglected as defined in specified other subdivisions and (2) there is a substantial risk that the child will be abused or neglected as defined in those subdivisions. (§ 300, subd. (j).)" (*In re I.J., supra,* 56 Cal.4th at p. 774.) Here, Father sexually abused B.B.'s half sister as defined in subdivision (d).[7] Because the first requirement is met, only the second requirement is at issue.

"[S]ubdivision (j) includes a list of factors for the court to consider: 'The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental

---

[7] Section 300, states, "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: . . . [¶] (d) The child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent or guardian or a member of his or her household, or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse."

14

condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child.' (§ 300, subd. (j).) . . . [¶] The broad language of subdivision (j) clearly indicates that the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of *any* of the subdivisions enumerated in subdivision (j)." (*In re I.J., supra,* 56 Cal.4th at p. 774.)

"Among the factors cited in subdivision (j) for the court to consider are the circumstances surrounding, and the nature of, father's sexual abuse of his daughter. By citing these factors, subdivision (j) implies that the more egregious the abuse, the more appropriate for the juvenile court to assume jurisdiction over the siblings. (§ 300, subd. (j).) 'Some risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great. . . . [¶] . . . [¶] Conversely, a relatively high probability that a very minor harm will occur probably does not involve a "substantial" risk. Thus, in order to determine whether a risk is substantial, the court must consider both the likelihood that harm will occur and the magnitude of potential harm.' [Citation.] In other words, the more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300. If the sibling abuse is relatively minor, the court might reasonably find insubstantial a risk the child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse." (*In re I.J., supra,* 56 Cal.4th at p. 778.)

We must determine whether, under the totality of the circumstances, substantial evidence supports the court's finding that father's sexual abuse of A.R. creates a substantial risk that B.B. will be abused. Father asserts the relatively minor magnitude of the potential harm at issue and the low probability B.B. would ever experience such harm undermines the court's finding. Father focuses on the nature of the abuse, the inconsistency and inconclusiveness of A.R.'s allegations, the fact that father did not tell A.R. to keep the abuse a secret, and father's agreement to leave the family home

15

following A.R.'s allegations.  We hold that the court's order was supported by substantial evidence.

### a.  The Nature of Father's Sexual Abuse

Father contends the sexual abuse of A.R. is "relatively 'minor," and "while serious in nature, cannot be fairly described as "aberrant in the extreme."  We agree that father's conduct here is not as egregious and aberrant as the conduct described in the cases on which he relies.  (See *In re I.J., supra,* 56 Cal.4th at p. 771 [repeated sexual abuse of teenage daughter over course of three years, including fondling, digital penetration of the child's vagina, oral copulation of the child's vagina, forcing the child to watch pornographic videos, and forcible rape]); *Los Angeles County Dept. of Children and Family Services v. Superior Court of Los Angeles County* (2013) 215 Cal.App.4th 962, 964-965 (*K.R.*) [sexual abuse of stepdaughter over five years, including repeatedly fondling the child's vagina and orally copulating her].)  Although concededly less shocking than the misconduct in these cases, father's acts of fondling A.R.'s bare breasts, back, and legs; touching and attempting to touch her vagina; slapping her buttocks; and removing his clothes and straddling her in bed nonetheless constitute aberrant sexual behavior.  Such conduct "'constitutes a fundamental betrayal of the appropriate relationship between the generations. . . .'" and "'abandon[ment] and contraven[tion of] the parental role. . . .' [Citations.]"[8] (*In re I.J.*, *supra,* 56 Cal.4th at p. 778.)

We find the instant case is informed by the decision in *In re P.A.* (2006) 144 Cal.App.4th 1339, cited favorably by the Supreme Court in *In re I.J.*, *supra,* 56 Cal.4th at pp. 775–776.  There, the family resided in a one-bedroom apartment, in which the three children shared a bunk bed.  The nine-year-old daughter slept on the top bunk and her two younger brothers shared the bottom bunk.  (*In re P.A., supra,* 144 Cal.App.4th at p. 1342.)  The daughter reported that after she had gone to bed one night, her father stood

---

[8]  A.R. repeatedly reported that father touched her vagina under her clothes. However, at the combined jurisdictional and dispositional hearing she testified that father did not touch her vagina but tried to when they were in the car.

16

over her and began to rub her vaginal area over her clothing.[9] (*Ibid.*) The *In re P.A.* court held that the father's sexual abuse of his nine-year-old daughter placed her and her two younger brothers at a substantial risk of harm and sexual abuse. (*Id.* at pp. 1342–43, 1347.)

We find the conduct at issue here to be comparable, if not more egregious. Father fondled A.R. on the couch and straddled her in bed; the father in *In re P.A.* fondled his daughter while standing next to her in bed. Further, unlike the father in *In re P.A.*, father here abused A.R. on several more occasions by fondling her legs and back and slapping her buttocks. Additionally, *In re P.A.* involved opposite-gendered siblings. The *In re P.A.* court found that the father's sexual abuse of his daughter put her two male siblings at risk of abuse, even though there was no indication that the father had sexually abused his sons or had any sexual proclivity towards males. (*In re P.A., supra,* 144 Cal.App.4th at p. 1345.) Given that a father's sexual abuse of his daughter has been found to put her male siblings at risk, the conduct in this case puts A.R.'s female half sibling at an even greater risk. (See *In re Karen R.* (2001) 95 Cal.App.4th 84, 91.) Indeed, "appellate courts have rarely if ever been faced with a situation in which a father sexually molests one female minor in the household and the juvenile court does not find another female minor in the household to be at risk. The cases cited categorically state that aberrant sexual behavior directed at one child in the household places other children in the household at risk, and this is especially so when both children are females. [Citation.]" (*K.R., supra*, 215 Cal.App.4th at p. 970.) We find that the nature of father's sexual abuse was sufficient to support the court's substantial risk finding.[10]

---

[9]   The daughter also reported that a second, similar incident occurred the following evening, but the petition was amended and sustained regarding only one incident. (*In re P.A., supra,* 144 Cal.App.4th at p. 1343.)

[10]   Father concedes that the fact that A.R. is not his biological child does not, by itself, insulate his biological daughter, B.B., from a potential risk of serious physical harm and sexual abuse.

17

### b.    A.R.'s "Inconsistent" and "Inconclusive" Allegations

Father contends—without citation to legal authority—that even though the court found A.R. to be credible, the "inconsistent" and "inconclusive" nature of her allegations must weigh significantly in our assessment of the substantial risk B.B. may face.  We disagree.  In essence, counsel invites us to give additional weight to a factor the trial court already has considered in evaluating A.R.'s credibility.  We will not reweigh the "inconsistent" and "inconclusive" nature of the allegations on appeal.  Absent extraordinary circumstances, we cannot reject the testimony of a witness the trier of fact chooses to believe, and we are bound under the substantial evidence standard of review to accept as true that part of the witness's testimony that supports the judgment.  (*In re Daniel G., supra,* 120 Cal.App.4th at p. 830.)

### c.    Secrecy and Father's Agreement to Leave the Family Home

Father suggests B.B. did not face a substantial risk of serious physical harm or sexual abuse because he did not tell A.R. to keep his abuse a secret and voluntarily left the family home following A.R.'s allegations.  He argues that both factors distinguish this case from *K.R.*, where the court found that a father's prolonged sexual abuse of his stepdaughter put his biological daughter at substantial risk of abuse.  (See *K.R.*, *supra*, 215 Cal.App.4th at p. 967-68.)  We are not persuaded.

Unlike the father in *K.R.*, father did not tell A.R. to keep his abuse a secret.  (See *K.R.*, *supra*, 215 Cal.App.4th at pp. 964-965.)  Nonetheless, the record clearly indicates father desired secrecy and A.R. understood as much.  Father only molested A.R. when they were alone or when others were sleeping.  On the one occasion someone did walk in on them, father pretended to fall on A.R. to avoid detection.  That father did not verbalize a desire for secrecy is inconsequential under these facts.

Father also argues that unlike the mother in *K.R.*, mother here did not have to put locks on the children's doors to protect them because father voluntarily left the family home when A.R. reported the abuse.  (See *K.R.*, *supra*, 215 Cal.App.4th at pp. 965-966, 970.)  However, the court in *K.R.* found that the father's withdrawal from the mother's home placed the child at great risk:  "This places [the child] at greater risk without

18

juvenile court jurisdiction because, absent juvenile court supervision, [the child] could be spending time alone with father away from mother's home, thereby providing greater opportunity for sexual abuse." (*Id.* at p. 970.) The same is true here.

## C. The Dispositional Order

After finding that a child is a person described in section 300 and therefore the proper subject of dependency jurisdiction, the court must determine "the proper disposition to be made of the child." (§ 358, subd. (a).) The dependency court is empowered to "make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child." (§ 362, subd. (a).) However, the court may not order a child removed from the custody of a parent unless it finds that, among other things, there is "a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child, "and there are no reasonable means by which the [child's] physical health can be protected without" removal. (§ 361, subd. (c)(1); see also *In re Isayah C.* (2004) 118 Cal.App.4th 684, 694-95.) However, a "parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate. The focus of the statute is on averting harm to the child. [Citations.] [T]he court may consider the parent's past conduct as well as present circumstances." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) We hold that the court's dispositional order was supported by substantial evidence.

Here, the court removed B.B. from father's custody, placed her with mother, and granted father monitored visits with B.B. Father does not raise any independent issue with regard to this dispositional order. His challenge is predicated entirely on the alleged impropriety of the jurisdictional order. As discussed above, however, the court's jurisdictional order was supported by substantial evidence, and we hold that the dispositional order was as well.[11]

---

[11] We disagree with DCFS that father has forfeited his right to challenge the dispositional order by failing to raise the issue in the dependency court. "There is a general exception to the forfeiture rule for instances when an objection would have been futile. [Citation.]" (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1001.) Father

**DISPOSITION**

The order of the juvenile court is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:


EPSTEIN, P. J.


MANELLA, J.

---

predicates his challenge to the dispositional order on the alleged impropriety of the jurisdictional findings. Once the dependency court announced its jurisdictional findings, it would have been futile for father to object to removal based on error in the jurisdictional findings.